**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CHONTE LONG**, <br><br> Plaintiff, <br><br> v. <br><br> **MOTION PICTURE ASSOCIATION OF AMERICA**, <br><br> Defendant. | Case No. 19-cv-2088 (CRC) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

In April 2017, Plaintiff Chonte Long provided a declaration supporting the sex discrimination case of one of her coworkers at the Washington, D.C. headquarters of the Motion Picture Association, Inc. ("MPA"), a trade association that represents major American film studios. A few months later, Long was told that her position as an administrative assistant was being eliminated as a part of the office's relocation to a new building. She would be laid off as a result. This lawsuit concerns Long's allegation that MPA's stated reason for her termination was really a pretext for unlawful sex discrimination and retaliation. Having filed a motion for summary judgment, MPA contends that it is ready for its close-up. But because Long has established a genuine dispute of material fact, a jury—not this Court or Mr. DeMille—must hold the camera. For the following reasons, the Court concludes that Long has offered enough evidence for a reasonable jury to conclude that MPA did not actually eliminate Long's position but rather included her in a reduction in force as a pretext for retaliation or discrimination. Accordingly, the Court will deny MPA's motion.

I.      **Background**

A.  Factual Background

1.   *The Jerri Smith and Delores Jones Complaints*

In 2007, Defendant MPA (previously known as the Motion Picture Association of America) hired Plaintiff Chonte Long as an administrative assistant in MPA's District of Columbia headquarters office, where she reported to MPA's Vice President of Administration Kathy Grant.  Pl.'s Opp. to Motion for Summary Judgment ("Opp.") Ex. 52; id. Ex. 55 at 2; id. Ex. 60.  During her decade of service with MPA, Long's role included a laundry list of duties relating to the upkeep and management of MPA's D.C. office, including: scheduling certain office events and movie screenings, serving as a backup receptionist, maintaining the office calendar, booking conference rooms, scheduling departmental meetings, reporting office maintenance issues, occasionally interacting with vendors delivering office and kitchen supplies, managing most of the department's accounting and payroll-related needs (including accounts payable, vendor invoices, office payroll, employee leave tracking, and the department's checking account), distributing mail within the office, and providing any other administrative support to Kathy Grant as needed.  See Opp. Ex. 2 at 37 (Long deposition); id. Ex. 4 at 66–69 (July 16, 2020 Grant deposition); id. Ex. 20 at 20–22 (Long interrogatory responses); id. Ex. 31 (August 1, 2022 Long declaration); id. Ex. 37 at 3–4 (Kelly McMahon notes); id. Ex. 38 (administrative assistant job description); id. Ex. 53 (Long performance evaluations); id. Ex. 55 (Long resume). In addition to these duties, Long also worked closely with MPA's in-house kitchen and catering staff, who helped MPA host screenings and other events at the organization's office, located at 1600 Eye Street in Washington, D.C.  Def.'s Motion for Summary Judgment ("MSJ") Ex. B at 67–68 (July 16, 2020 Grant deposition); id. Ex. C at 90–91 (Long deposition).

2

Starting in mid-2013, a few MPA events staff members began making complaints of discrimination in the D.C. office.  In June 2013, Jerri Smith, who had served as a maître d' and wait staffer, filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging age discrimination after she was terminated from her employment.  Opp. Ex. 17; MSJ Ex. C at 44.  Sometime shortly after MPA fired Smith, Plaintiff Long complained to then-MPA CEO, former-U.S. Senator Christopher Dodd, telling him that she "didn't agree with [Smith's] firing," which she felt was unfair.  Opp. Ex. 2 at 46–48 (Long deposition).  Dodd later told Kathy Grant about this conversation with Long, Opp. Ex. 4 at 142–44 (July 16, 2020 Grant deposition), after which Long maintains Grant put her on 60 days' probation and refused to give her an annual merit raise, Opp. Ex. 21 at 1 (2014 performance review showing merit increase of $0); id. Ex. 23 (May 2014 letter from Long complaining about poor performance review and probationary status).

After completing proceedings before the EEOC, in May 2015, Jerri Smith filed a lawsuit against MPA alleging age discrimination.  Opp. Ex. 18.  In her complaint, Smith specifically referred to Long, stating that after Smith was removed from MPA's work schedule, "Chonte [Long], a direct report to Kathy [Grant], went to Senator Dodd without Plaintiff's knowledge in an effort to help Plaintiff get her job back."  Id. at 8.  Smith's complaint further alleged that, "as reported to [Smith] by Germaine" Seagers, Kathy Grant's receptionist and one of Long's coworkers, "Senator Dodd called Kathy to his office to discuss the matter."  Id.  In its answer to Smith's complaint, filed in June 2015, MPA admitted that Long spoke to Dodd regarding Smith's termination.  Opp. Ex. 19 ¶ 15.

Also in June 2015, another MPA events employee, wait staffer Delores Jones, filed an EEOC charge against MPA, this one alleging sexual harassment by MPA Executive Chef Curtis

Coleman.  Opp. Ex. 24 (Jones EEOC charge).  Jones's charge also alleged that she did not complain about Coleman's harassment for fear of retaliation by MPA's upper management, stating that she was aware of "other waiters who have complained to management and were disciplined" thereafter.  Id.  In January 2016, Jones submitted a letter to the EEOC further outlining the basis of her sexual harassment claims.  Opp. Ex. 25.  As Jerri Smith had, Jones referred to Plaintiff Long in this letter, although not by name.  Specifically, to support her allegation that MPA executives retaliated against those who reported discrimination, Jones's letter referred to Long's 2013 conversation with Dodd regarding Smith's termination, stating: "Another MPAA employee who worked under Ms. Grant's supervision similarly complained of retaliation to Senator Dodd, and shortly thereafter, Ms. Grant stated that she was aware of her complaint, gave her [Chonte Long] an unjustified, inaccurate negative performance review, placed her on probation, and denied her annual (typically automatic) raise."  Id. at 5.

In August 2016, after exhausting the EEOC process, Jones filed a sex discrimination lawsuit, incorporating nearly verbatim the January letter's reference to Long's conversation with Dodd and Grant's alleged retaliation.  Opp. Ex. 27 ¶ 18.

### 2.  MPA's Layoff Planning

At around the same time that MPA was receiving Smith's and Jones's charges of discrimination, which referred to Long's purported support for them and experience of retaliation, a few high level MPA personnel—including Kathy Grant, Chief Operating Officer Diane Strahan, Chief Financial Officer David England, Senior Vice President for Human Resources Jason Monagas, and in-house counsel Kelly McMahon—began holding a series of meetings.  Lasting from roughly April 2016 through April 2017, the meetings focused largely on planning the MPA's upcoming relocation from its Eye Street building to a temporary space on K

Street, while the Eye Street location underwent renovations.  MSJ Ex. B at 36–37 (July 16, 2020

Grant deposition); Opp. Ex. 37.  Because MPA's interim location would not have a kitchen or in-

house event space, MPA's leadership began planning a reduction in force ("RIF") that would

result in a layoff of catering, waiting, and other events-oriented staff.  MSJ Ex. A at 19–20

(England deposition); Id. Ex. B at 36–38 (July 16, 2020 Grant deposition); Id. Ex. E at 9–10

(November 10, 2020 Grant deposition).  Kelly McMahon kept handwritten notes of these

planning meetings, which were produced in discovery in this case after Long filed a motion to

compel their disclosure.  See Op. and Order, ECF No. 31 (Nov. 22, 2021).

McMahon's notes reveal that MPA was considering terminating Long as early as April

2016.  In the group's April 8, 2016 meeting, McMahon recorded one participant's observation

that MPA would not "need kitchen staff" after the relocation because the new building "won't

have [a] kitchen."  Opp. Ex. 37 at 1.  But in addition to laying off kitchen staff, whose jobs

would be eliminated with the loss of kitchen space, McMahon's notes separately observed that

MPA had a "dysfunctional reception staff" and that the group was considering outsourcing,

rather than eliminating outright, some positions.  Id. at 1 ("Diane's preference is to outsource

reception forever"); id. ("[W]hat is the timing to figure out what need re: outsourcing?").  In

particular, someone proposed terminating "Chonte and [G]ermaine" "forever" and asked whether

it would be possible to terminate them "sooner" than the RIF affecting kitchen and event staff.

Id.  The notes from the April meeting further suggest that MPA would need replacements to do

Long and receptionist Germaine Seagers's jobs, stating that Kathy Grant would need "to vet a

firm" and "be happy with candidates" before terminating them.  Id. ("KG: needs to vet a firm +

be happy w/ candidates so has every [sic] ready when let C & J go").  To that end, the notes

recorded that Grant would "need[] to document in detail what" Long did "on a daily basis,"

perhaps to gain a better sense of what duties replacement candidates would need to take over.  Id. at 2.

Notes from the group's October 17, 2016 meeting further document efforts to reconfigure and reallocate some of Long's and Seagers's job duties.  After stating that "all waitstaff" and the "whole catering staff" would be eliminated, the notes from this date reflect considerable debate over what to do with the duties then handled by Long and Seagers.  Opp. Ex. 37 at 3–4.  In particular, the notes identified three positions—"receptionist," "untitled position (facilities mgr)," and "Chonte"—with accompanying job duties listed beneath them.  Id.  Beneath "receptionist," the notes listed "conf[erence] room booking," "acc[ounts] payable (some)," and "typical rec[eption] duties."  Id.  Next to that list, the notes asked whether Germaine should stay on to do those tasks, noting that it is "hard to justify letting her go" and suggesting putting her on a probationary period instead.  Id.  Beneath Long's name, the notes listed "email," "backup rec[eptionist]," and "conf[erence] room booking," three of Long's then-current job duties.  Id. at 4; see also Opp. Ex. 3 at 137.  And beneath the "untitled position (facilities mgr)," the notes listed several administrative tasks, including "making sure kitchen clean/stocked," "manage copy/fax machines," "leases etc.," "distr[ibution] of mail," "shredding," "managing phone sys[tem]," "backup to receptionist, "events coord[innating]/calendaring," and "landlord mgmt." Opp. Ex. 37 at 3–4; Opp. Ex. 3 at 137.

A week later, on October 25, 2016, McMahon's notes recorded a discussion in which someone from the group relayed COO Diane Strahan's then-current thinking about the RIF. Opp. Ex. 3 at 169.  Although the notes stated that Strahan was "not wedded to anything," apparently she also did not "want to have to hire 2 receptionist[s]" but rather would like to "outsource" so that MPA could "backfill" those positions.  Opp. Ex. 37 at 4; Opp. Ex. 3 at 168–

69.  Strahan also apparently suggested "outsourcing for events" rather than hiring a new communications or events person.  Opp. Ex. 37 at 4; Opp. Ex. 3 at 168.  Discussing these pages in her deposition, McMahon explained that, at this stage of planning, Strahan was "still in her outsourcing mode," meaning that MPA was planning to outsource or backfill the reception and events coordination duties described earlier.  Opp. Ex. 3 at 168–69.

McMahon's notes from the next several meetings continue to document the team's efforts to decide what to do with Long's and Seagers's positions.  As of October 2016, the group planned to layoff waitstaff in a RIF but separately noted a plan to "terminate" and "outsource" the jobs done by Long and Seagers.  Opp. Ex. 37 at 5; <u>see id.</u> ("Plan: outsource but still looking at it v. if cost effective to hire [employee], may do that.").  On October 26, the notes document one participant's acknowledgement of a "risk in firing and outsourcing [the] same position."  Opp. Ex. 37 at 5.  As McMahon explained in her deposition, the "risk" in question was that "eliminating a position that we're not actually eliminating and calling it part of the RIF" might "[a]ffect the integrity of that RIF and call it all into question."  Opp. Ex. 3 at 172.  By the next meeting on December 8, 2016, the group was considering filling both Long's and Seagers's roles with full-time employees, but was also now seriously considering the possibility of keeping Seagers on with "increased respon[sibilities]" while filling an "office assistant" role with a "new [employee]."  Opp. Ex. 37 at 6.  A day later, the group again stated that, based on the anticipated job duties, "2 [full-time] positions" were needed, and "outsourcing doesn't make sense."  Opp. Ex. 37 at 8.  As of February and April 2017, the group was in the process of deciding when to give employees notice of their terminations and whether they would continue to work up to MPA's relocation date.  Opp. Ex. 37 at 9–10.

### 3. *Long's Further Participation in the Jones Action*

While Grant, Strahan, Monagas, and McMahon debated what to do with Long's and Seagers's positions, Long's name resurfaced again in the litigation brought by Delores Jones. As noted above, in August 2016, Delores Jones filed a complaint against MPA alleging sex discrimination and referring to Long's "complain[t] of retaliation to Senator Dodd." Opp. Ex. 27 ¶ 18. At some point in late 2016 or early 2017, during discovery in the Jones case, MPA produced two emails involving Long—one sent on April 9, 2015 from Seagers to Long with Delores Jones's personal contact information, and another sent on April 14, 2015 from Long's work email to her personal email containing a list of MPA's wait staff, many of whom were potential witnesses in Jones's discrimination case. See Opp. Exs. 32–33. These emails were sent two months before Jones filed an EEOC charge against MPA in June 2015.

On February 2, 2017, Delores Jones sat for a deposition in her sex discrimination case, which McMahon and MPA's outside counsel—Karin Johnson—attended. Opp. Ex. 13 at 1–3. During the deposition, MPA's counsel called Jones's attention to the paragraph of her complaint that referred to Long. Id. at 207–08. Jones explained that, although she could not remember for sure, she might have learned about Long's discussion with Dodd and her subsequent probation from Long herself, suggesting that the two employees may have discussed these issues. Id. Jones then explained that she believed Long had "made a complaint" about retaliation to Dodd. Id. at 209–210. Shortly after Jones's deposition, on February 21, 2017, Jones and MPA filed lists of likely trial witnesses, both of which included Long. Opp. Ex. 29 at 2, 7; see also Opp. Ex. 28 at 2 (Jones docket, showing witness lists filed February 21, 2017).

Finally, on April 27, 2017, Long provided a signed declaration in support of Jones's discrimination claims. See Opp. Ex. 34 (email from Jones's counsel and Long's declaration). In

her declaration, Long stated, among other things, that MPA's Executive Chef Curtis Coleman—the subject of Jones's harassment claims—"treats the male staff differently than the female staff" and frequently made inappropriate sexual comments at work.  Opp. Ex. 34 at 2–3.  After receiving Long's declaration, MPA's Senior Vice President for Human Resources Jason Monagas—who was present at many of the planning meetings regarding MPA's forthcoming RIF—interviewed Long about her allegations for approximately three hours.  Opp. Ex. 66 at 1.

### 4.  Long's Termination and MPA's New Hire

On June 13, 2017, Monagas emailed a spreadsheet to Diane Strahan and David England, which he described as "detailing total severance amounts for staff impacted by DC office closure (temporary)."  Opp. Ex. 41 at 1.  The spreadsheet included both Long and receptionist Germaine Seagers as employees who would be laid off.  Id. at 2.  Although Monagas has stated in declarations and deposition testimony for this litigation that the spreadsheet was initially created on April 24, 2017 and that the decision to terminate Long was finalized weeks before MPA received her declaration in support of Delores Jones's discrimination claims, see MSJ Ex. G ¶ 11; MSJ Ex. G, Ex. 5 at 2–3; Opp. Ex. 7 at 54–55 (Monagas deposition), Long's supervisor, Kathy Grant, stated in her deposition as MPA's Rule 30(b)(6) representative that there was no point before the RIF when the layoff list was finalized and could not be changed, see Opp. Ex. 5 at 10–11.

After months of debating the RIF, on June 27, 2017, MPA finally informed Long that her employment would end a month later, on July 28, 2017.  Opp. Ex. 51 at 2.  In a letter to Long signed by Monagas, MPA stated that her termination was "a result of the temporary closure of our DC office and subsequent reorganization of the DC Administration department."  Id.  In a personnel action request form dated July 11, Monagas stated that the reason for Long's

termination was "Position Elimination."  Opp. Ex. 50.  MPA finalized Long's termination on

July 28.  Opp. Ex. 51 at 1.  Despite including Germaine Seagers on the RIF list circulated by

Monagas in June, however, MPA ultimately offered her the opportunity to stay on as

receptionist.  See Opp. Ex. 3 at 78; Opp. Ex. 20 at 20.  With Seagers staying at MPA, the final

RIF list included 17 employees—three engineers who worked in the building, the projectionist

who had helped show in-house film screenings, twelve kitchen or wait staff, and Long.  See Opp.

Ex. 41 at 2.  Of that group, Long was the only individual whose job was not linked directly to the

facilities or event spaces at MPA's former Eye Street location.

Sometime between MPA's announcement in June that Long's position would be

eliminated in the RIF and Long's last day on July 28, Jason Monagas and Kathy Grant made

contact with a staffing agency called PNP Staffing Group to begin vetting candidates to fill the

previously unnamed facilities assistant position discussed in McMahon's notes.  See Opp. Exs.

42–43, 54.  According to the job description MPA provided to PNP, the new job, alternatively

referred to as "Facilities Manager" or "Facilities Assistant," would have the following

responsibilities:  "cover switchboard at lunch, order & stock copier supplies, ability to lift 50lbs,

responsibility of monthly delivery orders for kitchen/pantry, pick up mail and deliver to

appropriate staff, other duties as assigned."  Opp. Ex. 54.

Starting on July 14, 2017, Kathy Grant, Jason Monagas, and another HR manager,

Dionne Brooks, exchanged a series of emails with a PNP employee about the new facilities

assistant position.  Among other things, Monagas stated that the position would "start on July

31" and that, although the role would be temporary to start, MPA might need "more permanent

support" after the relocation to its new space.  Opp. Ex. 43 at 5 (email dated July 17, 2017).  By

July 19, Monagas had apparently spoken with two candidates, and indicated a strong interest in

one named Sean Saleem.  Opp. Ex. 43 at 1–2; see also Opp. Ex. 42 (July 31 email identifying candidate as Saleem).  In his July 19 email with the PNP recruiter, Monagas also stated that, when Saleem visited MPA for an upcoming interview, while Long was still working there, he should "keep confidential why he is meeting with Kathy Grant" because MPA had "some inquisitive staff" and wanted "to keep confidential that we are looking for a temp to work in our new space until we're ready to announce that information."  Opp. Ex. 43 at 2.

As of July 31, 2017, the first business day after Long's departure, MPA had hired Saleem as the new "Facilities/Office Assistant," reporting, as Long had, to Kathy Grant.  Opp. Ex. 42.  Saleem wound up staying at MPA as the facilities/office assistant for roughly two years, working about 40 hours per week, after which time another man named Marlon Hallmon became facilities assistant.  Opp. Ex. 4 at 81 (July 16, 2020 Grant deposition); Opp. Ex. 7 at 168 (July 17, 2020 Monagas deposition); MSJ Ex. B at 98 (July 16, 2020 Grant deposition).

### B.  Procedural Background

Long filed an EEOC charge against MPA on April 23, 2018, alleging that her July 2017 termination was a result of sex discrimination and retaliation for her support of Jerri Smith and Delores Jones.  Opp. Ex. 36.  In June 2019, Long filed this lawsuit in the Superior Court of the District of Columbia alleging sex discrimination and retaliation in violation of Title VII of the federal Civil Rights Act and the D.C. Human Rights Act.  MPA removed the case to federal court.  See Notice of Removal, ECF No. 1 (July 15, 2019).  The case proceeded to discovery.  In November 2021, the Court ordered MPA to produce all pages of McMahon's meeting notes reflecting MPA's discussions about the 2017 RIF, described above, and compelled a limited

deposition of McMahon regarding those notes.  <u>See</u> Op. and Order, ECF No. 31 (Nov. 22, 2021).[1]

A few additional depositions later and with discovery complete, MPA filed a motion for summary judgment in June 2022.  The motion is fully briefed and ripe for decision.

## II.    Legal Standards

"Summary judgment is appropriately granted when, viewing the evidence in the light most favorable to the non-movant and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in her favor."  <u>Wheeler v. Georgetown Univ. Hosp.</u>, 812 F.3d 1109, 1113 (D.C. Cir. 2016).  To warrant summary judgment, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986).  "A fact is 'material' if it is capable of affecting the outcome of the litigation," and a dispute is "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>White v. Johnson</u>, 172 F. Supp. 3d 178, 182 (D.D.C. 2016).  At the summary judgment stage, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  <u>Anderson</u>, 477 U.S. at 255.  The Court may not "make credibility determinations or weigh the evidence," <u>Holcomb v. Powell</u>, 433 F.3d 899, 895 (D.C. Cir. 2006), but rather must review the record as a whole and ask whether "a rational trier of fact" could "find for the nonmoving party," <u>Wheeler</u>, 812 F.3d at 1113 (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).

---

[1] As explained in the ruling, the Court ordered production of the notes over MPA's privilege objections because MPA's counsel had selectively disclosed certain passages from the notes to opposing counsel during pre-litigation settlement discussions.

III. **Analysis**

    A. <u>Framework for Discrimination and Retaliation Analysis</u>

    Title VII of the Civil Rights Act makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Additionally, Title VII makes it unlawful for employers to retaliate against an employee because she "has opposed any practice made an unlawful employment practice by this subchapter" or because she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." <u>Id.</u> § 2000e-3(a).[2]

    Under the <u>McDonnell-Douglas</u> burden-shifting framework, a plaintiff establishes a prima facie case of discrimination by alleging that "she is part of a protected class under Title VII, she suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination." <u>White</u>, 172 F. Supp. 3d at 182–83 (quoting <u>Walker v. Johnson</u>, 798 F.3d 1085, 1091 (D.C. Cir. 2015)). To state a prima facie case of retaliation, the plaintiff must show that "(1) [s]he engaged in a statutorily protected activity, (2) a reasonable employee would have found the challenged action materially adverse, and (3) there existed a causal connection between the protected activity and the materially adverse action." <u>Dave v. Lanier</u>, 606 F. Supp. 2d 45, 50 (D.D.C. 2009). If the plaintiff makes out a prima facie case, then the burden shifts to

---

    [2] Long brings discrimination and retaliation claims under both Title VII and the D.C. Human Rights Act ("DCHRA"). Because "DCHRA claims are generally scrutinized under the same legal framework used by courts to analyze claims under Title VII," <u>Konah v. District of Columbia</u>, 815 F. Supp. 2d 61, 71 (D.D.C. 2011), an employee who has suffered an adverse employment action because of sex or protected activity "has been subjected to a violation of both statutes," <u>Mawakana v. Bd. of Trs. of Univ. of D.C.</u>, 926 F.3d 859, 863 (D.C. Cir. 2019); <u>accord Craig v. District of Columbia</u>, 74 F. Supp. 3d 349, 368 (D.D.C. 2014).

the employer "to articulate a legitimate, nondiscriminatory reason for its action."  White, 172 F. Supp. 3d at 183 (quoting Wheeler, 812 F.3d at 1114).  Once the employer has done so, the burden returns to the plaintiff to show that the employer's "stated reason for its actions was in fact pretext for unlawful discrimination."  Id.

The D.C. Circuit's opinion in Brady v. Office of Sergeant at Arms, 520 F.3d 490 (D.C. Cir. 2008), sets forth the analytical framework applicable at summary judgment in Title VII discrimination and retaliation cases, id. at 493–94; see also Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009) (explaining that "these principles" set out in Brady "apply equally to retaliation claims" as to discrimination claims).  "[B]y the time the district court considers an employer's motion for summary judgment," Brady explained, "the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision—for example, through a declaration, deposition, or other testimony from the employer's decisionmaker."  520 F.3d at 493.  "[O]nce the employer asserts a legitimate, non-discriminatory reason, the question whether the employee" has made out a prima facie case of discrimination or retaliation "is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'"  Id. at 493–94 (alteration in original) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510, 511 (1993)).  Rather, when considering a motion for summary judgment after the employer has asserted a legitimate, non-discriminatory reason for the challenged adverse employment action, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of" a forbidden characteristic.  Id. at 494; accord Calhoun v. Johnson, 632 F.3d 1259, 1261 (D.C. Cir. 2011) ("Under Brady, once the employer has proffered a legitimate, non-discriminatory reason for a

challenged employment action, the 'central question' is whether 'the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race.'").

"Usually, proffering 'evidence from which a jury could find that [the employer's] stated reasons . . . were pretextual . . . will be enough to get a plaintiff's claim to a jury.'" Calhoun, 632 F.3d at 1261 (alterations in original) (quoting George v. Leavitt, 407 F.3d 405, 413 (D.C. Cir. 2005)). "Although the plaintiff cannot always avoid summary judgment by showing the employer's explanation to be false," undermining the employer's stated reason for an adverse employment action "does have considerable evidentiary significance." Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1292 (D.C. Cir. 1998) (en banc); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) ("[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." (emphasis omitted)). Providing evidence to undermine the employer's stated reason for the unlawful employment action "eliminates the principal nondiscriminatory explanation for the employer's actions." Aka, 156 F.3d at 1292. And because "[e]vents have causes," when "the only explanations set forth in the record have been rebutted, the jury is permitted to search for others," including drawing an inference of discrimination "in appropriate circumstances." Id. Moreover, if the evidence suggests "that the employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should provide even stronger evidence of discrimination." Id. at 1293. Specifically, the "jury can conclude that an employer who fabricates a false explanation has something to hide" and that "that 'something' may well be discriminatory intent." Id.

Accordingly, courts "do not routinely require plaintiffs 'to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment.'" Hamilton v. Geithner, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (quoting Aka, 156 F.3d at 1290). But alongside evidence that the employer's proffered nondiscriminatory reason is false, the plaintiff may also support an inference of discrimination or retaliation by pointing to "the employer's better treatment of similarly situated employees outside the plaintiff's protected group," its "pattern of poor treatment of other employees in the same protected group as the plaintiff," or "other relevant evidence that a jury could reasonably conclude evinces an illicit motive." Wheeler, 812 F.3d at 1115 (quoting Walker, 798 F.3d at 1092).

B.  Retaliation Claim

Because MPA has asserted a legitimate, non-retaliatory reason for Long's termination—namely, that Long's "position was eliminated in connection with the MPA[]'s move from the Eye Street building to K Street"—the Court begins by assessing the evidence supporting and negating that explanation.  MSJ at 15.  The Court then turns to other evidence offered by Long from which a jury could conclude that her termination was retaliatory.

*1.  MPA's Non-Retaliatory Reason for Terminating Long*

Particularly in light of McMahon's contemporaneous notes of MPA's decisionmaking process, Long has established a genuine issue of material fact concerning whether her position was eliminated as part of MPA's 2017 RIF.  McMahon's play-by-play of the deliberations among Strahan, England, Monagas, and Grant provides an ample basis for a reasonable jury to believe that the RIF was not the cause of Long's termination but rather an excuse for it.

From the group's very first meeting in April 2016, participants distinguished between the kitchen and catering staff—who would not be needed because MPA would not "have [a]

16

kitchen"—and what the notes called MPA's "dysfunctional reception staff."  Opp. Ex. 37 at 1.
The fact that, from the start, the group identified the reception staff, which included Long and
receptionist Germaine Seagers, as "dysfunctional" suggests that some displeasure with them, and
not the elimination of their underlying duties, was the reason for including them in the RIF.  Id.
That conclusion is bolstered by one participant's asking, in that same meeting, whether it would
be possible to get rid of Long and Seagers "sooner" than MPA's move to K Street.  Id.  That
MPA was looking to terminate Long before the move, when her role as administrative assistant
unquestionably still existed, is strong evidence that MPA had some motive to terminate Long
other than the elimination of her position caused by the relocation.

Reinforcing that inference, Long has pointed to ample evidence from which a jury could
conclude that Long's position was not eliminated but rather that her duties were reallocated and
redistributed among Germaine Seagers, who stayed with MPA as receptionist, and Sean Saleem,
who was hired the day after Long was terminated to be the new facilities/office assistant.

First, McMahon's notes repeatedly refer to the group's consensus that MPA still needed
employees to cover Long's job duties.  At the April 2016 meeting, someone stated that Kathy
Grant would need "to vet a [staffing] firm" and "be happy [with] candidates" so that MPA would
be "ready" when they let Long and Seagers go—that is, ready to hire replacements.  Id.; Opp.
Ex. 3 at 110.  Other passages of McMahon's notes refer repeatedly to plans either to "outsource"
Long's job duties, see Opp. Ex. 37 at 5 (Oct. 26, 2016), or to replace her with a "new employee,"
see id. 37 at 6 (Dec. 8, 2016); Opp. Ex. 3 at 179–80.  By December 2016, McMahon's notes
reflect that the group believed "two full-time positions" would be necessary to cover the loss of
Long and Seagers.  Opp. Ex. 3 at 195; Opp. Ex. 37 at 8.  Moreover, McMahon stated in her
deposition that MPA COO Diane Strahan planned to "outsource" and "backfill" the reception

duties covered by Long and Seagers, a decision the group understood would "risk" undermining "the integrity of" the RIF."  Opp. Ex. 3 at 168–69, 172.

Contrary to MPA's assertion that it terminated Long in the RIF because her "duties revolved around" MPA's in-house screenings and other events, MSJ at 9, Long also cites emails written by Grant near the time of the move stating that, notwithstanding the loss of an events space, MPA would continue to host "evening events at alternative venues," Opp. Ex. 56 at 1.  A jury could infer that those events would continue to necessitate the work Long had been performing, such as, processing payments and invoices with local vendors and maintaining the schedule of MPA events.  Opp. Ex. 38.  From that inference, a reasonable jury could find that Long's job duties were not being eliminated but rather that she was being replaced, whether through outsourcing, hiring temporary employees, or finding a new full-time hire.[3]

The circumstances surrounding Sean Saleem's hiring, moreover, would permit a reasonable jury to conclude that Long was, in fact, replaced.  As described above, at one point in the RIF planning, McMahon's notes reflect that MPA's leadership, including at least herself, Monagas, and England, listed out some number of job duties for three roles—"receptionist,"

---

[3] Based on Kathy Grant's estimates at her deposition, MPA repeatedly asserts that 80% of Long's job duties were eliminated by the relocation.  See MSJ at 7–9; MSJ Ex. B at 148–49, 255–56.  MPA also points to Long's responses to questions at her deposition about whether she had responsibility for some of Saleem's duties, such as cleaning, restocking the supply room, or maintenance and repairs.  See Def.'s Statement of Undisputed Material Facts ¶¶ 41–59; Opp. Ex. 2 at 31–34 (Long deposition).  In light of the other testimony and documentary evidence concerning Long's job duties, however, a jury need not credit Grant's 80% estimate.  And, although Long answered at her deposition that she was not responsible for particular tasks as phrased by counsel, Long at other times clarified that she did have a role in reporting maintenance issues, that she occasionally interacted with vendors who provided kitchen and office supplies, and that she was certainly capable of performing other tasks, such as moving furniture or boxes, which Saleem might have performed.  Opp. Ex. 2 at 37 (Long deposition); id. Ex. 31 (Long declaration).  Long's resume and other documents describing her job duties at MPA, moreover, support those assertions.  See Opp. Exs. 38, 55.

"untitled position (facilities [manager])," and "Chonte."  Opp. Ex. 37 at 3–4.[4]  Beneath the

headings for "receptionist" and "untitled position," the group listed several duties that, up to that

point, had been performed by Long (or closely resembled Long's duties).  These duties included,

for instance, managing conference room booking and accounts payable, distributing mail,

serving as a back-up receptionist, reporting building maintenance issues, and managing the office

phone systems, events coordination, and calendaring.  See Opp. Ex. 37 at 3–4; Opp. Ex. 3 at

136–39; see also Opp. Ex. 2 at 37; id. Ex. 4 at 66–69; id. Ex. 31; id. Ex. 38; id. Ex. 53; id. Ex. 55

at 2.

    In her 30(b)(6) deposition, Kathy Grant defended the decision not to offer Long the

opportunity to take over the position that ultimately went to Saleem by stating that Long was

"overqualified" for a position that required "moving furniture, packing boxes," and the like.

Opp. Ex. 5 at 76–77 (Nov. 10, 2020 Grant deposition).  But, as Grant conceded at a separate

deposition, Saleem likely spent only a "couple of hours total" moving furniture in connection

with MPA's relocation.  Opp. Ex. 4 at 88–91 (July 16, 2020 Grant deposition).  Contrary to the

suggestion that the facilities manager position was mainly about manual labor and moving

furniture, both Grant's description of Saleem's actual tasks at MPA and the job description MPA

provided PNP Staffing Group included many tasks previously performed by Long, including

putting in service requests for building maintenance, dealing with office vendors, distributing

mail, providing switchboard relief for reception, and "other duties as assigned" by Grant.  Opp.

Ex. 4 at 81–82 (July 16, 2020 Grant deposition); Opp. Ex. 54 (PNP job description); see also

_____

[4] To the extent that MPA suggests Diane Strahan was the sole decisionmaker regarding
Long's termination, that suggestion is belied by McMahon's notes, which show a series of
deliberations among several high-level MPA managers about whether, when, and how to
terminate Long.  See Opp. Ex. 37.

Opp. Ex. 38 at 1 (describing Long's administrative assistant job duties as including "any necessary administrative support . . . for VP of Administration" Grant).  Moreover, Long's administrative assistant duties also included assisting with the payroll process for MPA's DC employees, and MPA has provided no explanation for why the relocation would have eliminated the need for an employee to monitor time and attendance reporting in payroll software and track the usage of leave.  Pl.'s Statement of Genuine Issues at 4.

Lest there be doubt, a jury could also draw a negative inference from the timing and secrecy of Saleem's hiring.  Saleem's first day of work was July 31, 2017, the very first business day after Long's July 28 departure.  Opp. Ex. 42.  A reasonable jury might infer from this fact that Saleem's start date was deliberately timed so that he could pick up Long's job responsibilities just after she left, without any interruptions.  Moreover, when making plans for Saleem to visit MPA and interview with Grant in late July—while Long was still working there—Jason Monagas told PNP Staffing Group that Saleem should "keep confidential" why he was meeting with Grant because MPA did not want "some inquisitive staff" to know they were hiring a new facilities assistant.  Opp. Ex. 43 at 2.  Again, a jury could infer from this secrecy that Long or others might see Saleem's hiring as evidence that he was replacing Long, whose position was purportedly being eliminated with the relocation.

In sum:  Between McMahon's notes, the overlap between Long's duties and those of her replacement, and other evidence suggesting MPA redistributed Long's duties among other members of the office, Long has raised genuine issue of fact concerning whether MPA's asserted reason for her termination was the actual reason.

2.  *Causation and Protected Activities*

"Usually, proffering 'evidence from which a jury could find that [the employer's] stated reasons . . . were pretextual . . . will be enough to get a plaintiff's claim to a jury.'" Calhoun, 632 F.3d at 1261 (alterations in original) (quoting George, 407 F.3d at 413).  Here, moreover, a jury reviewing McMahon's notes, MPA's interest in terminating Long "sooner" than the RIF, the decisionmakers' acknowledgement of the "risk" of outsourcing her role, and the secrecy with which MPA hired Saleem could further infer that MPA's stated explanation "is not only a mistaken one in terms of the facts, but a lie." Aka, 156 F.3d at 1293.  When "disbelief is accompanied by a suspicion of mendacity," the factfinder may infer an illicit motive "more readily." Id. at 1294 (quoting Hicks, 509 U.S. at 511).

MPA nevertheless maintains that Long has not pointed to a protected activity that is causally related to her termination.  Limiting its analysis to Long's 2013 complaint to former Senator Dodd and her 2017 declaration in support of Delores Jones's discrimination case, MPA essentially contends that Long's 2013 complaint, on the one hand, occurred too long before her 2017 termination and that her April 2017 declaration, on the other, came too late because, as McMahon's notes reflect, MPA was already considering terminating Long as early as April 2016.  See MSJ at 13–17.

MPA's arguments fail on several grounds.  First, although McMahon's notes show that MPA was at least considering terminating Long as early as April 2016, Long has also put forth evidence from which a jury could conclude that MPA's decision was not final until sometime after her 2017 participation in the Delores Jones discrimination litigation.  For instance, Kathy Grant testified at one of her depositions that, up until the RIF itself, there was no point at which the layoff list had become fixed so that no more changes could be made.  Opp. Ex. 5 at 10–11.

Further, McMahon's notes show that MPA's leadership vacillated in 2016 and 2017 about whether receptionist Germaine Seagers should be terminated or kept on after the relocation.  See Opp. Ex. 37.  Even as late as June 13, 2017, Monagas circulated a version of the layoff list that included Seagers as an employee to be let go, although MPA eventually offered Seagers the option to remain an employee.  Opp. Ex. 41 at 1–2.  From this evidence, a jury could conclude that, at least as late as the spring of 2017, the layoff list was still subject to change.[5]

Given that MPA's decision about terminating Long may have been in flux well into 2017, Long has pointed to several protected activities overlapping with that decision timeline.  An employer may not retaliate because an employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e-3(a).  "The statutory prohibition against discrimination is very broad, protecting an employee who 'participate[s] in *any* manner' in a Title VII proceeding."  Barnes v. Small, 840 F.2d 972, 976 (D.C. Cir. 1988).  For instance, in Barnes, the D.C. Circuit held that writing letters to support another coworker in that person's Title VII proceeding constituted participation in that proceeding and, therefore, protected activity.  Id.  What's more, because "what matters for purposes of a retaliation claim is whether the employer punishes the employee

---

[5] To be sure, Jason Monagas also testified that the decision to terminate Long was, at least in his view, finalized a few weeks before MPA received Long's declaration in the Jones litigation in April 2017.  Opp. Ex. 7 at 53–55 (July 17, 2020 Monagas deposition).  But at this stage, the Court must draw all inferences in Long's favor, and a jury could credit Grant's description of MPA's decision timeline over Monagas's.  And although MPA repeatedly asserts that the layoff list was *final* as of April 24, 2017—three days before MPA received Long's declaration—that date represents only the date that the spreadsheet listing employees to be laid off was *created*.  See MSJ Ex. G, Ex. 5 ¶ 5 ("I created the spreadsheet produced at MPAA000718 on April 24, 2017 to demonstrate a list of employees that would be laid off due to the Eye Street office closure.").  The fact that the spreadsheet was created before MPA received Long's declaration would not preclude a finding that the RIF was still subject to change thereafter.

based on its *belief* that the employee is engaging in protected activity," it is enough for an employee to allege that "the employer *believed* that [she] was engaged in protected activity." Murphy v. District of Columbia, 390 F. Supp. 3d 59, 69–71 (D.D.C. 2019); accord Johnson v. Napolitano, 686 F. Supp. 2d 32, 36 (D.D.C. 2010) ("A perception theory of retaliation does not rest on whether the employee actually asserts participation in a protected activity; rather, the theory applies so long as the employer believed that the employee was engaged in protected activity."); see also Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 572 (3d Cir. 2002) ("perception theory" of retaliation supported cause of action when employee could "show, as he claims, that adverse action was taken against him because [his employer] thought he was assisting his father [with a lawsuit against his employer] and thereby engaging in protected activity").

MPA does not dispute that Long's submission of a declaration in support of Jones, received by MPA on April 27, 2017, was protected activity.  See Reply at 10.  A jury could conclude that MPA had not yet finalized its decision to terminate Long as of that date and that Long's formal participation in Jones's suit was at least one but-for cause of that decision.  See Bostock v. Clayton County, 140 S. Ct. 1731, 1739 (2020).  But in addition to the declaration, Long also points out that, as of February 2017, both MPA and Jones had included Long as a probable witness in the Jones litigation.  Opp. Ex. 29 at 2, 7; see also Opp. Ex. 28 at 2.  Also in February 2017, Long was the subject of discussion in Jones's deposition, in which Jones suggested that the two had discussed Long's complaints of retaliation by Grant.  Opp. Ex. 13 at 207–10.  Kelly McMahon—MPA's in-house counsel and a participant in the high-level RIF planning meetings—was present for that deposition.  Id. at 1–3.  Further, a jury might also consider that MPA produced emails in the Jones litigation sometime in late 2016 or early 2017,

which showed that Seagers had sent Long Delores Jones's contact information and that Long

sent herself a list of wait staff who turned out to be likely witnesses in that case. See Opp. Exs.

32–33. Taking all this information into account, a jury could reasonably infer that, at least as of

February 2017, MPA perceived Long to be assisting Jones in pursuing her sex discrimination

claims, for instance, by speaking with Jones about her own alleged experiences of retaliation or

by offering to serve as a witness who would support Jones's allegations about Curtis Coleman.[6]

     MPA's arguments about causation falter for another reason as well: Even if the evidence

compelled the conclusion that MPA's mind was largely made up sometime in 2016, Long has

produced evidence that MPA may have perceived her to be supporting her coworkers'

discrimination cases even then.

     As recounted above, two of Long's coworkers—Jerri Smith and Delores Jones—filed

discrimination lawsuits against MPA in May 2015 and August 2016, respectively. Opp. Ex. 18;

Opp. Ex. 27. Both of these complaints, as well as a letter submitted by Jones's legal team to the

EEOC in January 2016, referred to Long either by name or by clear implication, specifically

recounting Long's 2013 complaint to Senator Dodd on Smith's behalf and her belief that Grant

retaliated against her by placing her on probation and denying her merit raise. See Opp. Ex. 18

at 8; Opp. Ex. 27 ¶ 18; Opp. Ex. 25 at 4–5. MPA retorts that Long's 2013 discussion with Dodd

was not protected activity because, as Long admits, she complained only that Smith's

---

    [6] MPA asserts that Long's appearance on witness lists in the Jones litigation is of no
importance because "every" catering or events employee who had worked with Jones was listed
and because MPA itself had also identified Long as a potential witness. MSJ at 16 n.6. Being
listed as a witness in an ongoing discrimination case, however, is sufficient participation to
constitute protected activity under Title VII. See Globus v. Skinner, 721 F. Supp. 329, 335
(D.D.C. 1989); accord Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 175 (2d Cir. 2005).
Drawing all reasonable inferences in Long's favor, as the Court must, Anderson, 477 U.S. at
255, the facts that other individuals were also listed or that MPA itself listed Long do not make it
unreasonable for a jury to conclude that Long was viewed as a participant in Jones's suit.

termination was "unfair" without suggesting a belief that the termination violated antidiscrimination law.  See Logan v. Dep't of Veterans Affs., 404 F. Supp. 2d 72, 77 (D.D.C. 2005) (opposition activities and complaints not "protected" when "they do not include a claim of discrimination based upon race, color, religion, sex or national origin"); Opp. Ex. 2 at 48 ("I may have said [Smith's firing] was unfair.").  But whether or not the 2013 discussion was itself protected, the fact that Long's name surfaced repeatedly in 2015 and 2016 in the context of supporting coworkers' discrimination claims against MPA would permit a reasonable inference that MPA believed Long was supporting Smith and Jones in their cases during that time.

For instance, the fact that both complaints recount Long's 2013 complaint and its aftermath could suggest that Long was discussing her own perceived experience of retaliation with Smith and Jones to lend factual support for their claims.  Long's appearance in these complaints might also suggest that she was willing to testify in support of Smith or Jones, thereby "assist[ing]" or "participat[ing]" in the "investigation" of their claims.  42 U.S.C. § 2000e-3(a).  In her deposition, moreover, Long stated that she did, in fact, talk with Smith about her termination, that she expressed to Seagers a willingness to serve as a witness in Jones's case, and that she spoke with Jones's attorneys sometime before being named as a potential witness.  See Opp. Ex. 2 at 48–49, 83–85.

As the Second Circuit explained in holding that an employee was entitled to protection from retaliation after being named as a potential witness in a discrimination case, "to leave an employee who is poised to support a co-worker's discrimination claim wholly unprotected" would be "destructive of" Title VII's goal of maintaining "unfettered access to statutory remedial mechanisms."  Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 175 (2d Cir. 2005) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997)).  Thus, the implication that Long "had

collaborated with" Smith or Jones in support of their lawsuits, or at least the reasonable possibility that MPA saw it that way, brings Long within Title VII's participation clause right around the time that MPA began planning the RIF in April 2016.  Id.  That implication is strengthened by McMahon's April 2016 notes referring to MPA's reception staff as "dysfunctional" and asking whether it was possible to terminate Long and Germaine Seagers "sooner" than the relocation to K Street, which would permit some inference of animus toward Long.  See Opp. Ex. 37 at 1; Opp. Ex. 3 at 85 (McMahon noting that no "specifics" were "given" to support the statement that reception was "dysfunctional").[7]

In conclusion, in light of the evidence suggesting both that MPA's stated reasons for terminating Long were pretextual, that MPA had reason to believe that Long was lending support to coworkers' discrimination cases, and that Long's involvement in those other cases was undeniable at a time when MPA had arguably not finalized its layoff plans, a reasonable jury could conclude that MPA retaliated against Long.  The Court will therefore deny MPA's motion for summary judgment as to Long's Title VII and DCHRA retaliation claims.

C.  Discrimination Claim

Much of the above analysis applies equally to Long's discrimination claim, to which the Court now turns.  As with Long's retaliation claim, MPA asserts that Long was terminated not for discriminatory reasons but because her job was eliminated in the 2017 RIF.  MSJ at 9.  For

---

[7] MPA cites cases emphasizing the need for a close temporal proximity between protected activity and termination to establish causation.  See MSJ at 13–14; Reply at 16–18.  But, as Long correctly points out, the importance of temporal proximity largely falls away when, as here, there is other evidence to support an inference of retaliatory motive, including animus or evidence that the employer's stated reasons were pretextual.  See Harris v. D.C. Water & Sewer Auth., 791 F.3d 65, 69–70 (2015) ("We need not decide whether a five-month time lag without more would be sufficient to render Harris' claim plausible because his complaint alleged more.").  In any event, Long's apparent participation in Smith's and Jones's lawsuits closes any gap in temporal proximity in this case.

the same reasons stated already, the Court concludes that Long has presented sufficient evidence for a reasonable jury to find that explanation false.  See Reeves, 530 U.S. at 147 ("[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." (emphasis omitted)).  Among other things, Kelly McMahon's contemporaneous notes show that MPA's leadership contemplated terminating Long "sooner" than the relocation of the D.C. office, that MPA determined two full-time staff positions would be needed even after the relocation, and that, at various times, MPA's leadership discussed outsourcing or backfilling Long's role.  See Opp. Ex. 37.  The notes also would permit the inference that MPA's leadership discussed redistributing many job duties previously covered by Long either to MPA's receptionist or to a then-untitled facilities manager position.  Id. at 3–4. Finally, Long has produced evidence from which a jury could conclude MPA ultimately did hire a new employee—facilities assistant Sean Saleem—to do work either that Long had done as administrative assistant or that she was readily qualified to do.  Compare Opp. Ex. 54 (facilities assistant job description for PNP Staffing Group), and Opp. Ex. 37 at 3–4 (McMahon's notes allocating job duties), and MSJ Ex. G, Ex. 7 (facilities assistant job description), with Opp. Ex. 38 (administrative assistant job description), and Opp. Ex. 55 (Long resume), and Opp. Ex. 31 (August 1, 2022 Long declaration).

Although Long's evidence undermining MPA's stated reasons for her termination "does have considerable evidentiary significance," Aka, 156 F.3d at 1292, whether the evidence could support the conclusion that Long's sex was a real reason for her termination presents a closer case than Long's retaliation claim.  Aside from the evidence that Long's job was not eliminated with the RIF, there is relatively little evidence of sex-based discriminatory intent.  Nevertheless, combined with the evidence that MPA's stated explanation was false, the evidence that Long

was replaced by a man with arguably equal or lesser qualifications is enough for a jury to conclude that MPA's stated explanation was "pretextual, and that the termination was actually the result of [sex] discrimination." Wheeler, 812 F.3d at 1115.

In addition to citing evidence that "the employer is lying about the proffered justification," Long may support an inference of discrimination by "offering evidence of more favorable treatment of similarly situated persons who are not members of the protected class." Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO, 548 F.3d 137, 144 (D.C. Cir. 2008). Although "it is neither a sufficient or a necessary condition," the "fact that one's replacement is not in the same protected class as the discharged employee 'may help raise an inference of discrimination.'" Stith v. Chadbourne & Parke, LLP., 160 F. Supp. 2d 1, 13 (D.D.C. 2001) (quoting Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir. 1996)).

Here, as already explained, a jury could conclude that many of Long's duties were reallocated to the new facilities assistant position, filled by Sean Saleem. "Whether two employees are similarly situated ordinarily presents a question of fact for the jury," George, 407 F.3d at 414 (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)), and in this case, there is ample evidence for a jury to conclude that Saleem and Long were similarly qualified for the assistant role. For one, Kathy Grant admitted in one of her depositions that Long was, if anything, "overqualified" for the facilities assistant job and that "the responsibilities were a lot less than what Chonte would have been used to." Opp. Ex. 5 at 77. Long's and Saleem's resumes likewise support the inference that they were similarly qualified; they both had similar backgrounds and experiences as executive or administrative assistants. Opp. Ex. 55 at 2–3; Opp. Ex. 58 at 1, 3–4. Even if Saleem's job description included some duties that Long had not performed—such as "cleaning, dusting, polishing of first floor entertainment space" or

28

coordinating "annual fire drill practice" or "OSHA compliance," MSJ Ex. G, Ex. 7—there is no reason to believe Long was incapable of doing this work, and Saleem's resume demonstrates no special expertise in those areas.  See Opp. Ex. 58.

The Court does not hold that, absent the other evidence of pretext in this case, the sole fact that Long was replaced by a man would warrant denying summary judgment.  See, e.g., Randall v. Howard Univ., 941 F. Supp. 206, 215 (D.D.C. 1996) ("The plaintiff next argues that the fact that she was replaced by a 'male subordinate with lesser qualifications' proves she was discriminated against by the defendant. It does not. The plaintiff has not shown that the reasons for her removal were phony.").  But alongside the other evidence of pretext and mendacity in this case, and drawing all reasonable inferences in Long's favor, the Court cannot say that no reasonable jury could find evidence of discrimination here.

Accordingly, the Court will deny MPA's motion for summary judgment as to Long's Title VII and DCHRA discrimination claims as well.  *That's a wrap.*

Case 1:19-cv-02088-CRC   Document 55   Filed 03/23/23   Page 30 of 30

**IV.  Conclusion**

For these reasons, it is hereby

**ORDERED** that [Dkt. Nos. 42 & 43] Defendant's Motion for Summary Judgment is

DENIED.  It is further

**ORDERED** that the parties shall appear for a status conference on May 9, 2023 at 11:00

A.M. in Courtroom 27A.

**SO ORDERED**.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>March 23, 2023</u>